BRAMAN v. STEWART.

1. INNKEEPERS—INJURY TO GUEST—DEFECTIVE STAIRWAY—NOTICE
   TO PROPRIETOR.
   Where the proprietor of a hotel and her servant in charge of
   such matters testify that they used a flight of stairs many
   times a day, and that if there had been any defect therein
   they would have noticed it, and there is evidence that a
   defect existed, there is sufficient evidence on the question of
   notice of the defect, to go to the jury.

2. SAME—ACTIONABLE DEFECT—WHAT CONSTITUTES.
   Where the brass nose pieces on the front edge of the steps of a
   flight of stairs were bent upwards from one-eighth to three-
   eighths of an inch in different places, the court cannot say,
   as a matter of law, that there was no actionable defect in
   such condition.

Error to Macomb; Tucker, J.   Submitted May 8, 1906.
(Docket No. 121.)   Decided September 20, 1906.

Case by Jennie M. Braman against Kate S. Stewart for
personal injuries.   There was judgment for defendant on
a verdict directed by the court, and plaintiff brings error.
Reversed.

*T. A. E. & J. C. Weadock* (*L. J. Weadock*, of coun-
sel), for appellant.

*Byron R. Erskine*, for appellee.

BLAIR, J.   Plaintiff brought this action to recover
damages alleged to have been occasioned by the negligence
of the defendant, the proprietor and operator of the Sher-
man House hotel in Mt. Clemens, in not keeping certain
brass strips or nose pieces fastened to the front or outside
edge of each tread or step of a stairway in said hotel in a
proper state of repair, whereby the plaintiff, while care-
fully descending the stairs, caught the heel of her shoe on

one of said brasses and was precipitated to the bottom of the stairway, suffering serious injuries.   The trial judge directed a verdict for the following reasons:

"There is no dispute in this case but that the plaintiff on the evening of August 4, 1903, fell down the stairs of the Sherman House and was seriously injured; but the defendant, Mrs. Stewart, cannot be held liable for the resulting damage unless she was in some way to blame for the accident; unless some duty of hers was neglected with regard to providing a reasonably safe stairs or means of access from one floor to another, of her hotel.   The questions, then, in this case are:

"*First.* Were these stairs in a reasonably safe and fit condition to be used for the purpose they were made for, at the time of the accident?

"*Second.* Was Mrs. Braman's fall due to any defect in or on the stairway?

"*Third.* If it was due to a defect in the stairway, was that defective condition that may have caused the accident known to Mrs. Stewart, or was it such a defect as ordinary supervision, care, and prudence on her part, would have brought to her knowledge?

"*Fourth.* Was plaintiff herself in the exercise of due care at the time of the accident?

"Now, while these may be questions of fact ordinarily for a jury to pass upon, and not for the court to determine, yet, as I understand the rule, whenever, in any case, the court becomes satisfied that the great weight of the evidence is on one side or the other of a case, and to such an extent that in case a verdict were rendered against the side so having the greater weight of evidence in its favor that the court would be in duty bound to set aside that verdict and order a retrial, then it becomes the duty of the court to assume the entire responsibility, and to direct a verdict.

"Now, in this case, it seems to me that while some evidence has been introduced by the plaintiff, tending to show that she fell down those stairs by tripping upon one of the brass pieces, called 'nose pieces,' that were screwed to the front edge of each step, yet it seems to me the case is wholly wanting in evidence fairly tending to prove that plaintiff fell down stairs by reason, or because of any defective nose piece or want of repair in the stairs; nor is there, in my opinion, evidence upon which a verdict should be permitted to be based, showing that these stairs, at the

time of this accident, were either so faultily constructed or so out of repair as to make them unsafe for use in traveling up and down by persons who were themselves in the exercise of due care; or that the defendant's attention had ever been called to any claimed defect either in their construction or their defective condition by reason of wear and tear."

We think the case should have been submitted to the jury.

The plaintiff testified:

"That day, as I arrived at the top of the stairs, my husband was with me, a little behind; he stopped to lock the door, and I started on ahead of him. I supposed the stairs in a public place are perfectly safe. I simply stood at the stairs as I do always when I come to a new pair or stairs, take my bearings, as they would say, and go very carefully. I size the stairs up to see that I know what they are like, and go down carefully as I can. I was on the west side of the stairs; the right hand side. As I went down I tripped the heel of my shoe on the brasses, and it simply pitched me forward like that, and the first thing I knew, I was going so-fashion downstairs. * * *

"I had a talk with Mrs. Stewart in relation to my injury, and reference was made to the stairway. She met me in the hallway and asked me how my hand was, and I told her it wasn't any better; it seemed to me just the same; and I said to Mrs. Stewart: 'I am a poor advertisement for your house, because when I go on the street, people ask me "What's the matter" with me; and I tell them that I came here well, and am going home a cripple; that I fell down the stairs at the Sherman House; and they ask me what is the matter with the stairs at the Sherman House.' She said that I was lucky; there were others."

Plaintiff's husband testified:

"The stairway has from the bottom 10 or 11 straight steps, ordinary steps; above that 4 steps with an angle, forming the angle of the steps, what might be called the wind, where the stairs turned to go at a right angle to the first stairs. They turn to the right or to the left. They turn to the right going up, to the left coming down. There were 4 steps there that were narrower on the right and wider as you go to the wall. I should judge it

was 4 inches wide, wide enough to take one spindle; possibly 18 or 20 inches wide at the wall; above those stairs there were more straight steps after you made your turn and then the landing at the top; a hand rail on the right hand side as you go up; but none on the left hand side towards the wall.   *   *   *   When we got to the stairway, my wife was ahead, and she went on down the stairway or started to go.  She was probably on the— well, she was on the last two steps, I should judge; I couldn't tell for her clothes, but I should judge she had one foot on the next to the last lower step and one foot on the last lower step in the wind, and I had just come around the corner and was at the top; I had just got started down possibly three or four steps back of her and she tripped and threw out her hand and fell.   *   *   *   After the accident, I observed the condition of the steps.   They were covered with a rubber sheet of corrugated rubber. There was a space between the wall and the rubber, and a space between the spindles and the rubber of 5 or 6 inches.   The fastening was what they call a nosing of thin, hard sheet brass, brought up over the edge and partly on the top of the step similar to that one that you have, only thinner, and there was no indications of a corrugation extending along the same as that one has.   There might been on the under side but there was not on the top; it was smooth.   My recollection is that the entire piece was smooth.   It may have been slightly corrugated at the bottom.   It was put on the step, the brass was fastened on the under side of the steps.   It left it raised above the rubber as the rubber would wear away.   Immediately after the accident the top of it was not level; it was uneven on the edges, wavy, and in places there were places that were raised as if something had been struck against it and raised the edge of the brass.   My impression is that the top of the nosing was raised up from the rubber as it was torn away from a quarter to three-eighths in places. I didn't measure it.   *   *   *

"I have seen those strips since.   Out of those I have noticed, they were all put on with the screw on the top with the exception of one that I noticed, that had the screws on the edge, and none on the bottom of the brass. I have taken particular attention of the way these nosings are put on on account of this accident.   I have had no experience putting any on, nor never had any put on.   I have noticed the condition they were in.   I have never

seen any this way, with the screws on the bottom, only in this one instance. I am competent to say or able to say what the effect would be when the nosings are screwed on from below, as to the top of the nosing being in the same position as when it was put on, or whether it would change with use. The top would not remain; as the rubber wears away, the top is away from the rubber; the brass is away from the rubber, and the more you tighten it on the bottom, the further it would be away. * * * I made an examination of the stairs that night afterwards, after the hurry was over and excitement, an hour and a half or two hours after the accident. I examined them again the next morning. They were not in the same condition. Had the appearance of being hammered over with a hammer and trying to straighten them out. I couldn't tell you how many. I simply noticed those where the accident occurred at the first and second of those gore steps going up, winding. Saw no other change in them. About an hour and a half or two hours after the accident, I found the brass or brasses extending above the rubber in one or more places. I found a number of places. I couldn't tell you the exact number. All of the steps had spots where the edges were displaced, the edges of the brass. The projection above the surface was all the way from a thirty-second of an inch up to three-eighths anyway in some places. In the morning the projection was less than that. At night, the projections were from a sixteenth to possibly three-eighths of an inch. I didn't measure them. In the morning there were places there where there was one-sixteenth of an inch anyway.

" Q. There was very little change took place from the night to the morning?

"A. That is quite a change from a sixteenth to three-eighths. I didn't measure it at any time. I had no difficulty in seeing.

" Q. How many did you think had been changed during the night, how many brasses?

"A. They had the appearance of all being straightened up.

" Q. All having been straightened up?

"A. More or less trying to straighten them up.

" Q. Pounded down?

"A. They had that appearance, yes. .

" Q. That night when you examined them, what did you find about the brasses?

"*A*. I found that the edge was uneven in places where the brass had been sprung up in spots, and that the brasses were quite smooth on the edges. I saw no places where the rubber was worn through. There were no corrugations on them that I saw."

Ray Lapointe testified that in January, 1903, a man requested him to notify the hotel people that he had stumbled on the stairs; that he notified the clerk and the clerk told him to notify John Lueck, the porter, which he did.

" *Q*. Did you see the condition the brass was in, and did you report it?

"*A*. I did, sir.

" *Q*. Did you see what condition it was in?

"*A*. Yes, sir, there was one corner knocked up from carrying down a trunk. * * *

" *Q*. Did he call your attention to the brass facing on the step at the time?

"*A*. He did, sir. I did not look at it.

" *Q*. Do you know how far it stuck up?

"*A*. Just a little ways. It was knocked up from a trunk. * * *

" *Q*. Were you going up stairs when this striking the nosing occurred, when they were carrying it up?

" *A*. I was, sir. I was helping to carry it up. It strikes very nearly every step we would go onto with it. I didn't see anything, I heard it. The baggage was mostly always carried on trunk carriers, except when we got a light trunk and we could carry it with our hands. I don't know who helped me carry it or if I was ahead or behind. I didn't see anything strike the stairs, and didn't examine the stairs. He just told me. We went up the stairs often, and I glanced at it. There was just a little bit of a piece hit. I think that a trunk tore it. It was fixed at once."

Defendant testified in her own behalf:

" My attention was never called to any accident on the step or to any defect in the steps. John Lueck was head porter, and Will Kale. It was the porter's duty to go over the stairways and clean them and look after it. I would be using that stairway a dozen times a day. At the time this accident occurred, these nosings and rubbers were in perfect condition.

"*Q.* You heard the testimony of Mr. Braman, that some of the steps the nosings stood up from a sixteenth of an inch to three-eighths, on part of the steps; and that was caused by something striking it or testimony of that kind? What would you say as to that, Mrs. Stewart?

"*A.* I think it would be impossible without my knowing it and my attention being called to it. The stairs were not in that condition. At the time the accident happened, Miss Iry called my attention to it. I went upstairs at once to Mrs. Braman's room, and then I went downstairs; and I thought about the accident, and I called John Lueck, the porter. I wanted him to go over the stairs carefully and see if there was any reason why she should have fallen or could have fallen. We looked them over carefully and found them in perfect condition. Those nosings were not standing up as has been described. My impression is that these nosings were fastened from above. I have examined those steps a number of times. Examined them immediately after this accident happened with great care.

"*Q.* And you have only an impression as to how they were fastened, is that right?

"*A.* Well, I could swear they were fastened from above.

"*Q.* Oh, you make it stronger now?

"*A.* I could swear to it, yes, sir.

"*Q.* Now you are positive that they were fastened from above?

"*A.* Yes, I am. I have some in the house fastened from below; it is customary to fasten them either way. One way is as good as another. * * * It was the porter's duty to go over these stairs in the morning before the guests came down before breakfast and brighten the brasses. I never knew him to go on there and hammer the brasses. We never gave it any thought because they never came up. We never had occasion to hammer them down. The brasses were on the steps in December, and I knew then for the first time the claim that was being made by Mrs. Braman. The next month they were taken off."

John Lueck testified for defendant:

"*Q.* Whose duty was it, Mr. Lueck, to make any repairs around there?

"*A*. Well, sir, it is mine, head porter's, to look after and see that it is done.

"*Q*. Were any repairs made there that night on the stairs?

"*A*. Not a thing.

"*Q*. Had any of these nosings been bent up before?

"*A*. No, sir, not to my knowledge, of any kind.

"*Q*. How often do you use those stairs?

"*A*. I go every day as much as 50 times; some days 10, some days 5, some days, maybe, more.

"*Q*. Did you ever hear any complaint from any of the guests?

"*A*. Never.

"*Q*. Of people falling on those stairs?

"*A*. Never, never. That is the first complaint since I ever have worked there. * * *

"*Q*. How were the screws?

"*A*. Underneath.

"*Q*. Every one on the step on the strairway was screwed on from underneath?

"*A*. Yes, sir.

"*Q*. They were put on in this way?

"*A*. Yes, sir, they were on from underneath. * * * I have gone up there once or twice when some of them got loose where somebody with a trunk or something or with a grip even, knocked it a little out, give the screw half a turn and it would be all gone.

"*Q*. If a trunk struck the edge, it would knock the edge up?

"*A*. Knock the corner up.

"*Q*. How would you get the corner down?

"*A*. I would take it off and take it outside and bend it over.

"*Q*. How many of these did you take off?

"*A*. I never did that at all.

"*Q*. Why did you say that you did that?

"*A*. That is the way that I would do it. * * *

"*Q*. Did you take it off in order to use a hammer?

"*A*. No, sir.

"*Q*. Did you ever use a hammer on these things?

"*A*. I have used it once or twice; that is all. * * * I did go over them occasionally.

"*Q*. With a hammer?

"*A*. Not with a hammer, with a screw driver, to tighten the screws.

"*Q.* Did you use a hammer on these nosings to fasten or to hammer them down?

"*A.* Yes, I have used a hammer occasionally.

"*Q.* Now, how many times did you use a hammer?

"*A.* I don't believe I have used it over two or three times that I have been there.

"*Q.* Why didn't you tell us in the first place that you had used a hammer on these brasses?

"*A.* I didn't catch on to what you meant by it.

"*Q.* What kind of a hammer did you use?

"*A.* Just a small hammer, just a tack hammer.

"*Q.* Was it just a tack hammer?

"*A.* That is the only hammer I have got, just a tack hammer.

"*Q.* Was the facing that was on heavier than this?

"*A.* Yes, sir.

"*Q.* A good deal?

"*A.* Yes, sir.

"*Q.* And you used a tack hammer to straighten it out?

"*A.* It is a little heavier than a tack hammer.

"*Q.* How heavy; let's get at it?

"*A.* There's two or three different weights of hammers; tack hammer, and medium size, and carpenter's hammer.

"*Q.* Then it was a medium size you used?

"*A.* Yes, sir.

"*Q.* What place would you hammer and fasten it down?

"*A.* Near the edge and middle. * * * The Lapointe boy did not at any time tell me that these stairs needed repairing."

Defendant's counsel cite in support of the court's direction of a verdict: *Idel* v. *Mitchell*, 158 N. Y. 134; *Jennings* v. *Tompkins*, 180 Mass. 302.

In *Idel* v. *Mitchell*, the point decided, as stated in the syllabus, is that to warrant recovery—

"For a personal injury caused by a protruding nail in a stair, the evidence must establish either that prior to the accident the defendant knew of the protrusion of the nail, or that the nail had protruded for such a length of time that the defendant should have known of it."

If there was such evidence in the case before us, *Idel* v. *Mitchell* is authority for its submission to the jury. Such evidence was furnished by the defendant and her

porter, John Lueck.   Defendant testified that she used the stairway a dozen times a day, and that if the nosings stood up one-sixteenth to three-eighths of an inch, as testified by plaintiff's husband, "I think it would be impossible without my knowing it and my attention being called to it."   In *Jennings* v. *Tompkins* the court say:

"This case, therefore, presents the general question how far a board can be allowed to be worn down by use without its being a defect as against persons who have a right to use it.   The line must be drawn somewhere, and it is necessarily to some extent an arbitrary matter where it is to be drawn.   We are of opinion that if the board is worn so that a nail projects three-sixteenths of an inch, there is no defect."

Conceding the legitimacy of the court's conclusion upon the facts of that case, we do not regard it as authority for the proposition that the projection of the nose pieces in this case in different places from one-sixteenth to three-eighths of an inch would not, as a matter of law, constitute defects.

The judgment is reversed, and a new trial granted.

CARPENTER, C. J., and MCALVAY, HOOKER, and MOORE, JJ., concurred.