FISHBAINE *v.* WHITE STAR LINE.

1. NEGLIGENCE—EVIDENCE—RES GESTÆ.

In an action for personal injuries sustained by plaintiff as a result of sliding down a chute in an amusement park operated by defendant, statements of defendant's employees made a few seconds after the accident were admissible as part of the *res gestæ*, but not those made upon a subsequent day.

2. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

The questions of defendant's negligence and of plaintiff's contributory negligence, *held,* under the testimony, questions of fact for the jury.    CLARK, J., dissenting.

Error to Wayne; Mandell (Henry A.), J.    Submitted June 7, 1923.    (Docket No. 66.)    Decided July 19, 1923.

Case by Marion Fishbaine against the White Star Line for personal injuries.    Judgment for defendant on a directed verdict.    Plaintiff brings error.    Reversed.

*William Henry Gallagher* and *Edward J. Fallon,* for appellant.

*Douglas, Eaman, Barbour & Rogers,* for appellee.

MOORE, J.    On Sunday, August 10, 1919, the plaintiff boarded a boat owned by the defendant company and used to convey passengers for hire from Detroit to Sugar Island, an amusement park operated by the defendant.    This park contained various amusements, among other devices a toboggan slide about 18 feet high and descending until it came within 20 inches of the ground or thereabouts.    To use the slide one

Authorities discussing the duty and liability of owner or keeper of place of amusement respecting injuries to patrons are collated in notes in 1 L. R. A. (N. S.) 427; 3 L. R. A. (N. S.) 1132; 19 L. R. A. (N. S.) 772; 32 L. R. A. (N. S.) 713; 42 L. R. A. (N. S.) 1070; L. R. A. 1915F, 690; 22 A. L. R. 610.

ascended a ladder.    The plaintiff ascended the ladder, slid down the chute and was badly hurt.    Defendant offered no testimony.    At the close of the testimony for the plaintiff the trial judge directed a verdict in favor of the defendant.    The case is here by writ of error.

We quote from the brief of appellant:

"(1) Are statements, pertaining to the failure to perform a duty, made by an employee of a company within a matter of seconds after the happening of an accident, admissible in evidence as a part of the *res gestæ?*

"(2) Is the owner of a toboggan slide, who maintains a sand pit at the end of the slide and knows that the sand is ordinarily kicked out of the pit, negligent in failing to keep such pit properly filled, when the bottom of the hole is composed of hard earth?

"(3) Under the facts, was plaintiff guilty of contributory negligence?"

Each of these questions is discussed at length.

The statements referred to were first admitted in evidence, and then stricken out.    Some of these statements were made within a few seconds after the accident.    Some of them were made upon a subsequent day.    We think the testimony of what was said within a few seconds of the occurrence was admissible as part of the *res gestæ* (*Stebbins* v. *Township of Keene,* 55 Mich. 552; *Ensley* v. *Railway,* 134 Mich. 195), and that which was said upon the later occasion was properly stricken out as not part of the *res gestæ.*

The other questions may be discussed under the inquiry of whether the trial judge was justified in directing a verdict for the defendant.

At this time it may be well to quote some of the testimony.    A third cousin of the plaintiff, who was with her at the time, testified in part:

"We stood there and watched them for a few minutes, and Miss Fishbaine thought she would try

it, after seeing some of the others go up and down.
She went up the step ladder, and then came down the
slide, and had to be carried away.

"At the base of the slide there was a hole about two
feet in diameter, more or less. Miss Fishbaine landed
right in that hole. The hole was about six or eight
inches deep. The character of the soil at the bottom
of the hole was hard. When Miss Fishbaine slid down
this slide, she landed right in the hole. There was
some gentlemen that was standing close by there, and
myself assisted her. We carried her to the ladies'
rest room."

A deputy sheriff who was at the island at the time
of the accident testified in part:

"When I found Miss Fishbaine there at the base of
the slide, I found her with this foot under, and the
other one like that, she was on the ground. The
ground at that point was sandy, there was a depres-
sion there. That depression as I observed was about
two feet in diameter and I should say about three
inches deep. * * *

"I observed the ground at the base of that slide,
the character of the soil was sandy. There is not a
natural sandy soil there. The sand was about prob-
ably five or six feet in diameter.

"Q. That is to say, there is a sand pit prepared at
the base of the slide, is that the idea?

"A. Yes. I did not observe the depth of the pit.
I don't know how far below the sand the natural
ground is to be found. I observed the children or
others that day upon the slide, as they would descend,
they would kick the sand around a bit, but not very
much. They would to some extent, just what their
heels would hit, when they landed. The sand would
fly out as they struck the ground. * * *

"I saw some sand at the base where the people light.
I don't mean dirt, I mean sand, river sand. I don't
know how deep down the sand went, that was spread
around at the base of the slide five or six feet. Every
person that came down feet in the sand, why, the sand
would give way. It was a dry day and the sand was
dry. * * *

"With regard to this sand at the base of the slide,

I said it was river sand.   I think that they wheeled it in there from the river.   I seen them working before that, about two months back.   I was over there one day.

"Q. When you saw them do that, who do you mean?
"A. The man working on the island."

The plaintiff testified in part as follows:

"We went upon the morning boat and were there upon the island most of the day.   We intended to return to Detroit at 5:30 in the evening, but the boats were crowded to capacity and we had to wait for the next boat.   *   *   *   After the departure of the evening boat, we walked around several times, and finally we stopped at the slide, the toboggan slide.   We stood there a few minutes watching the different ones go down.   *   *   *   Then I thought I would like to go on too, so I got on the ladder.   I got on at the top of the slide, sat down, adjusted my skirts and slid down.   My foot caught in the hole and I fell over, and there was an awful crack, together with terrific pain, my leg broke, and I just fell down in a heap and screamed.   *   *   *

"When you got off, the momentum it just—you did not get off slowly, you just go one, two, three, down. Then you cannot get to your feet right away.   You take a few running steps.   Well, these running steps that the others took, I couldn't take because my foot got caught in the hole.   You couldn't just slip off easily.   The momentum—the force just pushes you down, and when you get to the bottom you sort of take a few running steps forward.   You don't land straight on your feet, and stand up straight, but my foot got caught in the hole and I just fell over, that's all."

The principle of law involved in this case is not unfamiliar to this court.   See opinion of Chief Justice GRANT in *Blakeley* v. *White Star Line*, 154 Mich. 635.

In *Scott* v. *Athletic Ass'n*, 152 Mich. at p. 688 (17 L. R. A. [N. S.] 234, 125 Am. St. Rep. 423), Justice OSTRANDER said for the court:

"Whether responsibility to the plaintiff is grounded, in the form of action instituted, upon a contract or upon a duty, it exists, if at all, because of an implied contract. The implied contract was that the stand was reasonably fit and proper for the use to which it was put; the duty was to see to it that it was in a fit and proper condition for such use. Neither plaintiff nor the public generally would be expected to examine the stand and judge of its safety. This consideration, and the probable consequences of failure of the structure, imposed upon the responsible and profiting persons the duty of exercising a high degree of care to prevent disaster. They were not insurers of safety, they did not contract that there were no unknown defects, not discoverable by the use of reasonable means; but, having constructed the stand, they did contract that, except for such defects, it was safe. 1 Thompson on Negligence, §§ 994-997; 21 Am. & Eng. Enc. Law (2d Ed.), p. 472; *Francis* v. *Cockrell,* L. R. 5 Q. B. 184, 39 L. J. Rep. (N. S.) Q. B. 113, 291. See, also, *Fox* v. *Buffalo Park,* 21 App. Div. (N. Y.) 321 (163 N. Y. 559)."

In *Wine* v. *Newcomb, Endicott & Co.,* 203 Mich. at p. 451, Justice OSTRANDER, again speaking for the court, said:

"It does not appear that the plaintiff was acting differently from ordinary people who visit establishments like that of defendant to examine merchandise —to shop. As a general proposition a customer in such a place has the right to rely upon the safety of passage along passageways used by customers. *Brown* v. *Stevens,* 136 Mich. 311; *Bloomer* v. *Snellenburg,* 221 Pa. 25 (69 Atl. 1124, 21 L. R. A. [N. S.] 464)."

See *Jacobs* v. *Hagenbeck Wallace Shows,* 198 Mich. 73; *Braman* v. *Stewart,* 145 Mich. 548; *Branch* v. *Klatt,* 165 Mich. 666; *Yarington* v. *Huck,* 218 Mich. 100.

We think under the facts disclosed by this record there were questions for the jury and that it was error for the trial court to direct a verdict.

The judgment is reversed and a new trial ordered, with costs to the appellant.

WIEST, C. J., and FELLOWS, MCDONALD, BIRD, SHARPE, and STEERE, JJ., concurred.

CLARK, J. (*dissenting*). Verdict was properly directed. Judgment should be affirmed.